454 S.E.2d 65

**STATE of West Virginia ex rel. the Honorable John R. FRAZIER, Judge of the Circuit Court of Mercer County, Relator,**

v.

**Don B. MEADOWS, Sheriff of Mercer County, and the County Commission of Mercer County, Respondents.**

No. 22333.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 13, 1994.

Decided Dec. 8, 1994.

Norwood Bentley III, Bowles, Rice, McDavid, Graff & Love, Charleston, William Flanigan, Sanders, Austin, Swope & Flanigan, Princeton, for relator.

David Burton, Burton & Kilgore, Princeton, Michael Gibson, Gibson & McFadden, Princeton, for respondent Don B. Meadows, Sheriff of Mercer County.

John Hedges, Byrne & Hedges, Morgantown, amicus curiae for West Virginia Judicial Ass'n.

CLECKLEY, Justice:

In this original proceeding in mandamus, the relator, the Honorable John R. Frazier, Judge of the Circuit Court of Mercer County, petitions this Court to issue a writ of mandamus requiring the respondents, Don D. Meadows, Sheriff of Mercer County, and the Mercer County Commission, to provide the relator with a qualified bailiff of the relator's choice who would work under his control and direct supervision.

Judge Frazier maintains that a bailiff is an officer of the court and, therefore, should be under the control and supervision of the presiding judicial officer. He contends that the Supreme Court of Appeals has the inherent power to administer the judicial court system pursuant to the 1974 Judicial Reorganization Amendment (Reorganization Amendment) and that this amendment is superior to any other statutory language. On the other hand, the respondents assert that, notwithstanding the Reorganization Amendment, W.Va.Code, 51-3-5 (1923), commands the sheriff of a county to provide bailiffs for the circuit courts and is the controlling law.

We agree generally with the respondents that the Reorganization Amendment does not supersede W.Va.Code, 51-3-5. Nevertheless, to honor and fulfill the purposes of both the Reorganization Amendment and the statute, we hold that the circuit judge directs and controls bailiffs assigned to him and that where a substantial, genuine, and irreconcilable conflict exists between the sheriff and circuit court judge concerning the selection of a bailiff that impairs, or is likely to impair, the court's ability to function properly, the ultimate authority to make a reasonable selection of a qualified bailiff is constitutionally vested in the court. Because we find such a conflict exists in this case, the writ is granted as moulded.

## I.

On March 10, 1994, the relator informed Sheriff Meadows and John Rapp, President of the Mercer County Commission, that he intended to hire a full-time replacement for his retiring bailiff.[1] Sheriff Meadows replied by letter and raised certain concerns. Sheriff Meadows specifically noted his expectations that the bailiff would be available to serve civil papers when the judge is on vacation, that the bailiff would be an employee of the Mercer County Sheriff's Department, and that he or she would be subject to the same policy as other members of the Sheriff's Department. Judge Frazier responded and suggested a number of options that he thought would satisfy Sheriff Meadows' concerns. Judge Frazier also wrote a similar letter to Commission President Rapp. The correspondence between the Sheriff, Commission President Rapp, and Judge Frazier continued without resolution.

In an effort to amicably conclude this matter, Judge Frazier, Sheriff Meadows, Commission President Rapp, T.A. Warden, a member of the County Commission, and a number of other individuals met on May 31, 1994. The group decided that Judge Frazier would interview any deputy sheriff that applied, but could hire from the civilian population. The salary range for the bailiff was $15,000–$18,000 annually and the bailiff position was to be moved from the Sheriff's Department to the Office of the Circuit Clerk, upon action of the Mercer County Wage and Hour Review Board.

By letter dated June 3, 1994, President Rapp, in his capacity as the Chairperson of the Mercer County Wage and Hour Review Board, denied the relator's request for a civilian bailiff because he believed statutory law and Rule VII of the Trial Court Rules required them to deny the request. Shortly thereafter, Sheriff Meadows informed the court's bailiff that his services were no longer needed.[2] Judge Frazier was in the midst of an extended trial when the Sheriff took this unilateral action, and he asked his bailiff to remain in service and agreed to pay the bailiff's expenses personally, if necessary.[3]

Sheriff Meadows then assigned Deputy Sheriff Roger Kessinger as bailiff pursuant to W.Va.Code, 51–3–5, and Rule VII of the West Virginia Trial Court Rules. The bailiff came under the Sheriff's control and supervision. Thus, the Sheriff retained the authority to assign the bailiff to other jobs, promote him, set his pay, promulgate policy changes affecting him, and grant his request for vacation.

## II.

### A.

The primary issue presented in this original proceeding is whether the judges of the circuit courts have the authority to hire and control their bailiffs. The relator and the West Virginia Judicial Association, through an *amicus curiae* brief, argue that the circuit court judge has the exclusive authority to control court employees. On the other hand, the respondents argue that W.Va.Code, 51–3–5, and Rule VII of the West Virginia Trial Court Rules place court bailiffs under the supervision and control of the Sheriffs' Departments.

We begin, as we must, by examining the statutory language, bearing in mind that we should give effect to the legislative will as expressed in the language of the statute. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985). Generally, words are given their common usage. *See State ex rel. Underwood v. Silverstein*, 167 W.Va. 121, 125, 278 S.E.2d 886, 889 (1981) (quoting Syllabus Point 2, *State v.*

---

1. The relator also sent letters dated April 1, April 10, April 28, and May 20, 1994, repeating his desire to hire a civilian bailiff.

2. Judge Frazier's bailiff officially retired on April 30, but had continued to serve by agreement as interim bailiff pending his replacement.

3. Judge Frazier argues that he has been allowed to hire several civilian bailiffs over the years.

The notes from the June 2, 1994, meeting of the Wage and Hour Review Board indicate that Sheriff Meadows admits that he knew of the past practice of civilian bailiffs and that he did not attempt to remove Judge Frazier's civilian bailiffs. Sheriff Meadows firmly maintains, however, that the practice of using civilian bailiffs is contrary to the statutory law.

*Elder*, 152 W.Va. 571, 165 S.E.2d 108 (1968) stated "[w]here the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation."); *see also, Gant v. Waggy*, 180 W.Va. 481, 483, 377 S.E.2d 473, 475 (1988) (stating that "this Court ... will not change the plain language employed in framing the statute"); *Palestine Info. Office v. Shultz*, 853 F.2d 932, 938 (D.C.Cir.1988). Courts are not free to read into the language what is not there, but rather should apply the statute as written. If the statute "is clear," Syllabus Point 1, *State ex rel. Estes v. Egnor*, 191 W.Va. 36, 443 S.E.2d 193 (1994); if "the statutory scheme is coherent and consistent," *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290, 298 (1989); and if the law is within the constitutional authority of the lawmaking body that passed it, then the duty of interpretation does not arise, and the rules for ascertaining uncertain language need no discussion. Syllabus Point 1, *W.Va. Radiologic Technology Bd. of Examiners v. Darby*, 189 W.Va. 52, 427 S.E.2d 486 (1993).[4]

■ Although courts should not ordinarily stray beyond the plain language of unambiguous statutes, we recognize the need to depart from the statutory language in exceptional circumstances. 2A G. Sutherland, *Statutory Construction* § 46.07 at 126 (5th ed. 1991) (collecting exceptions). Courts, therefore, may venture beyond the plain meaning of a statute in the rare instances in which there is a clearly expressed legislative intent to the contrary, *Russello v. United States*, 464 U.S. 16, 20–21, 104 S.Ct. 296, 299–300, 78 L.Ed.2d 17, 22–23 (1983); in which a literal application would defeat or thwart the statutory purpose, *Commissioner v. Brown*, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75, 82 (1965); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973, 980–81 (1982); or in which a literal application of the statute would produce an absurd or unconstitutional result, *United States v. Amer. Trucking Ass'ns*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345, 1351 (1940). Where warranted a departure must be limited to what is necessary to advance the statutory purpose or to avoid an absurd or unconstitutional result.

W.Va.Code, 51–3–5, provides that the sheriff shall be the attending officer in circuit court proceedings.[5] Rule VII elaborates by declaring that a sheriff or deputy sheriff shall be present while the court is in session.[6] Under these provisions, the sheriff is charged with the duty of maintaining a sufficient number of deputies for the court.

The relator and the West Virginia Judicial Association (Judicial Association) argue that the statute cannot be given effect because W.Va.Code, 51–3–5, and Rule VII became "constitutionally outdated" upon the ratification of the Reorganization Amendment in 1974,[7] and that it is contrary to clearly ex-

---

4. Syllabus Point 1 of *Darby* states:
   " ' "When a statute is clear and unambiguous and the legislative intent is plain the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Point 1, syllabus, *State ex rel. Fox v. Board of Trustees of the Policemen's Pension or Relief Fund of the City of Bluefield, et al.*, 148 W.Va. 369 [135 S.E.2d 262 (1964)].' Syllabus Point 1, *State ex rel. Board of Trustees v. City of Bluefield*, 153 W.Va. 210, 168 S.E.2d 525 (1969)."
   *See also United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442, 447 (1917); *State ex rel. Estes v. Egnor, supra.*

5. W.Va.Code, 51–3–5, which covers the attending officers to West Virginia courts, reads: "The supreme court of appeals shall not be attended by any sheriff, but every circuit court, county

court, and other court of record of any county shall be attended by the sheriff of the county in which it is held, who shall act as the officer thereof."

6. Rule VII of the Trial Court Rules provides:
   "The sheriff, or a deputy, shall be present at all times while the court is in session.
   "The sheriff shall provide a sufficient number of deputies to maintain order in the courtroom at all times. The rules and orders of the court pertaining to conduct in the courtroom shall be enforced by him or them."

7. The 1974 Amendment, termed the "Judicial Reorganization Amendment," rewrote Article VIII, substituting §§ 1 to 15 for former §§ 1 to 30, amended § 13 of Article III, and added §§ 9 to 13 to Article IX.
   This Amendment substantially changed the prior judicial system by centralizing administrative

pressed judicial precedent in this and other jurisdictions regarding the inherent authority of the court to hire and control its court personnel. As a consequence, the relator, the Judicial Association, assert that the statute violates the separation of powers provision of the West Virginia Constitution. The relator thus maintains that the only remaining purpose of W.Va.Code, 51–3–5, is to determine whose budget will cover the bailiff's salary.

### B.

■We believe that the relator's argument that the statute is unconstitutional misconstrues the function and interaction of W.Va.Code, 51–3–5, Rule VII, and the Reorganization Amendment. The Reorganization Amendment centralized the administration of the State's judicial system and placed the administrative authority of the courts in the hands of this Court. *Rutledge v. Workman,* 175 W.Va. 375, 332 S.E.2d 831 (1985). In *Rutledge,* the Court noted that the Reorganization Amendment vested "exclusive authority over administration" in the Supreme Court. 175 W.Va. at 379, 332 S.E.2d at 834. Although it is true that the Reorganization Amendment had a profound effect on the structure of the West Virginia court system and changed the administrative functions of the courts, the Reorganization Amendment did not completely negate all laws previously passed covering administrative procedures.[8]

■ The efficient administration of the judicial system is essential to our duty to implement justice in West Virginia; and, therefore, we must be wary of any legislation that undercuts the power of the judiciary to meet its constitutional obligations. In fact, West Virginia's commitment to the separation of powers is apparent from the provisions of Article V of the West Virginia Constitution, which mandates the division of governmental powers.[9] In prior cases, we have observed the importance of having a free and independent judiciary. In *State ex rel. Brotherton v. Blankenship,* 158 W.Va. 390, 402, 214 S.E.2d 467, 477 (1975), we stated:

> "The system of 'checks and balances' provided for in American state and federal constitutions and secured to each branch of government by 'Separation of Powers' clauses theoretically and practically compels courts, when called upon, to thwart any unlawful actions of one branch of government which impair the constitutional responsibilities and functions of a coequal branch."

*See also State ex rel. Steele v. Kopp,* 172 W.Va. 329, 337, 305 S.E.2d 285, 293 (1983) ("the role of this Court is vital to the preservation of the constitutional separation of powers of government where that separation, delicate under normal conditions, is jeopardized by the usurpatory actions of the executive or legislative branches of government").

■ Recent amendments to the West Virginia Constitution affecting the allocation of

---

control. In Syllabus Point 2, in part, of *Rutledge v. Workman,* 175 W.Va. 375, 376, 332 S.E.2d 831, 831–32 (1985), this stated:

"The judicial article (Article VIII) of the *W.Va. Const.* creates the office of clerk of the circuit court and the circuit clerk is an officer within the judicial system; therefore, the hierarchy of administrative control established by *W.Va. Const.* art. VIII, § 3 that reposes overall administrative authority for the entire judicial system in the Supreme Court of Appeals by and through its Chief Justice and Administrative Director, and thereafter reposes local administrative authority in the circuit court through the judge or chief judge of each circuit also controls the office of circuit clerk[.]"

**8.** The Reorganization Amendment not only gave this Court the power to promulgate rules, but also provided that such rules shall " 'have the force and effect of statutory law and operate to

supersede any law that is in conflict with them.' " Syllabus Point 2, *Bennett v. Warner,* 179 W.Va. 742, 743, 372 S.E.2d 920, 921 (1988), *quoting* Syl.Pt. 1, *Stern Brothers, Inc. v. McClure,* 160 W.Va. 567, 236 S.E.2d 222 (1977). *See also Teter v. Old Colony Co.,* 190 W.Va. 711, 441 S.E.2d 728 (1994); *State v. Davis,* 178 W.Va. 87, 90, 357 S.E.2d 769, 772 (1987). The important point culled from these various cases is that statutory provisions are superseded only if there is a *direct* conflict.

**9.** Article V reads as follows:

"The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time, except that the justices of the peace shall be eligible to the legislature."

powers have emphasized the necessity for maintaining the independence of the judiciary. These changes include the entirety of the Reorganization Amendment and its concept of a unified court system administered by this Court and not the legislature. *See, e.g., State ex rel. Quelch v. Daugherty,* 172 W.Va. 422, 306 S.E.2d 233 (1983). More specifically, that same amendment altered Section 1 of Article VIII to provide that the judicial power of the State "shall be vested *solely*" in this Court and its inferior courts. (Emphasis added). The predecessor provision to Section 1, though similarly worded, did not include the limiting adverb "solely." In addition, the Modern Budget Amendment insulated the judiciary from political retaliation by preventing the governor and legislature from reducing the judiciary's budget submissions. *W.Va. Const.,* art. V, § 51; *State ex rel. Bagley v. Blankenship,* 161 W.Va. 630, 246 S.E.2d 99 (1978); *State ex rel. Brotherton v. Blankenship,* 157 W.Va. 100, 207 S.E.2d 421 (1973). Taken together, these amendments create a strong and independent judiciary that can concentrate on delivering a high quality, fair, and efficient system of justice to the citizens of West Virginia. Such measures are particularly useful in a State such as ours that continues, and appropriately so, to elect judges to fixed terms of office. That is, because judges remain ultimately beholden to the electorate, the need is even greater to insulate the judiciary from the more routine politics of the annual budget process and legislative or executive manipulation.

Taking these principles into account and for reasons we more fully explain below, we partially agree with both sides in this case. First, longstanding historical practice and necessity preclude a literal application of the statute: the sheriff does not, and cannot, personally serve as the bailiff. Thus, we interpret W.Va.Code, 51–3–5, to mean that the sheriff *or* his designee (*i.e.,* a deputy

sheriff) must perform as court bailiff, as is set forth in Rule VII. Second, W.Va.Code, 51–3–5, vests the selection of a bailiff in the sheriff. Third, whoever serves as bailiff must submit fully to the direction and control of the circuit judge. (This conclusion further reinforces the practical necessity that, in today's world, a deputy sheriff—and not the sheriff—will fulfill the role of bailiff.) Fourth, where substantial, genuine, and irreconcilable conflicts develop between the sheriff and circuit judge over the selection and direction of a bailiff, the judge must control.

### III.

█ With the statute so construed, the procedure established by W.Va.Code, 51–3–5, does not threaten judicial independence and effectiveness. Under that system, the sheriff selects and assigns one or more deputy sheriffs to serve as bailiff, and the circuit judge then assumes responsibility for direction and control of the bailiff's duties. There is nothing inherent in that system that invites disruption of a fair and efficient judicial process. We assume that the system will function normally with the cooperation of both the sheriff and the circuit judge; that the sheriff will attempt to supply the court with capable personnel; that the judge will have input into, but not dictate the selection decision; and that the judge will have the bailiff at his disposal and control.[10] When the system operates in that manner, there is no conflict between the Reorganization Amendment and either W.Va.Code, 51–3–5, or Rule VII of the Trial Court Rules. Thus, we disagree with the relator and the Judicial Association and find that the Reorganization Amendment did not supersede W.Va.Code, 51–3–5, and Rule VII of the Trial Court Rules regarding the selection of deputy sheriffs who will serve as

---

10. We expect that the system will indeed function as described in the text and that such matters as are presented in this case will be resolved at the local level. In our view, the more local control the better, and the less intervention by this Court the better for local control. Of course, with local control comes local responsibility, and that includes the responsibility to follow the pro-

cedures outlined in the text and to resolve reasonably and amicably any dispute that might arise. Although we will meet our duty to decide conflicts when they are presented to us, we do not wish to become a mediator for disagreements that ought not to go beyond their county of origin.

bailiffs.[11]

When analyzing the constitutionality of a statute, we do not discard law as easily as the relator urges us to do. It is no small matter to jettison the decision of a coequal branch. Our legislature promulgates statutory laws through a democratic process; and, for that reason it is imperative that we carefully examine a law before determining its constitutionality.[12] This Court in *State ex rel. Frieson v. Isner,* 168 W.Va. 758, 778–79, 285 S.E.2d 641, 655 (1981), stated:

"Acts of the Legislature are presumed to be constitutional, and courts will interpret legislation in any reasonable way which will sustain its constitutionality. *State ex rel. City of Charleston v. Coghill,* 156 W.Va. 877, 207 S.E.2d 113 (1973); *State ex rel. Appalachian Power Co. v. Gainer,* 149 W.Va. 740, 143 S.E.2d 351 (1965). Thus where a statute is susceptible of more than one construction, one which renders the statute constitutional, and the other which renders it unconstitutional, the statute will be given the construction which sustains constitutionality. *State ex rel. Slatton v. Boles,* 147 W.Va. 674, 130 S.E.2d 192 (1963), *Board of Education v. Board of Public Works,* 144 W.Va. 593, 109 S.E.2d 552 (1959)." [13]

Similarly, the relator is incorrect in his assumption that the Reorganization Amendment destroyed the purpose, reason, and need for W.Va.Code, 51–3–5. Although the structure of our court system was radically different when W.Va.Code, 51–3–5, was originally passed, this does not mean that the statute is no longer valid. To create the precedent that we are being urged to do would subject numerous statutes to unproductive challenges.

Accordingly, we conclude that under the provisions of W.Va.Code, 51–3–5, and Rule VII, the sheriff of a county is charged with the duty of providing bailiffs for the circuit

11. As indicated above, a conflict between the judiciary and another branch of government must be a "substantial, genuine and irreconcilable" intrusion to constitute a constitutional infringement. *See State ex rel. Frieson v. Isner,* 168 W.Va. 758, 777, 285 S.E.2d 641, 654 (1981) (although legislative enactments cannot restrict or impair the power of the judiciary, "where the intrusion upon the judicial power is minimal and inoffensive, and is consistent with and intended to be in aid of the aims of the Court with respect to the regulation of the practice of law, such legislation may be upheld as being in aid of the judicial power").

12. Even though we find that the statute in question is constitutional, we are not backing away from our duty to strike unconstitutional legislation. In fact, we have previously noted that "[l]egislative enactments which are not compatible with those prescribed by the judiciary or with its goals are unconstitutional violations of the separation of powers." *State ex rel. Quelch v. Daugherty,* 172 W.Va. 422, 424, 306 S.E.2d 233, 235 (1983) (*see also* cases cited therein concerning other state supreme courts invalidating legislation that encroached upon the judiciary).

13. *See also Gibson v. W.Va. Dept. of Highways,* 185 W.Va. 214, 225, 406 S.E.2d 440, 451 (1991) (holding that "[w]e begin with the premise that there is a presumption of constitutionality with regard to legislation"); *State ex rel. Alsop v. McCartney,* 159 W.Va. 829, 838–39, 228 S.E.2d 278, 283 (1976) (cautioning that "whenever this Court is called upon to interfere with the exercise of the powers of the other branches of government on constitutional grounds, and there are legitimate alternative remedies available, this Court should always adopt the least obtrusive remedy"). In *Farley v. Graney,* 146 W.Va. 22, 33–34, 119 S.E.2d 833, 840 (1960), we recognized the "supremacy of the legislature in its own field" when we stated:

" 'In resolving the question of the constitutionality of an act of the Legislature * * *, two controlling principles must be kept in mind. The first of these principles is that the power of the legislative department * * * is subject only to the limitations imposed by the State and Federal Constitutions. *State v. Woodward,* 68 W.Va. 66, 69 S.E. 385, 30 L.R.A.N.S., 1004 [(1910)]. The test of legislative power in this State is constitutional restriction. That which the Constitution of this State does not prohibit the Legislature from doing, and which does not violate the Constitution of the United States, the Legislature may do *Harbert v. Harrison County Court,* 129 W.Va. 54, 39 S.E.2d 177 [(1946)]; *State Road Commission v. County Court,* 112 W.Va. 98, 163 S.E. 815 [(1932)]. The power of the Legislature of a State is an attribute of sovereignty and its power would be absolute if there were no constitutional limitations. *Howard v. Ferguson,* 116 W.Va. 362, 180 S.E. 529 [(1935)]. The other principle is that any doubt as to the constitutionality of an act of the Legislature will always be resolved in favor of the validity of the statute. *State [ex rel. Cosner] v. See,* [129] W.Va. [722], 42 S.E.2d 31 [(1947)]; *State v. Furr,* 101 W.Va. 178, 132 S.E. 504 [(1926)].' *State v. Harrison,* 130 W.Va. 246[, 249], 43 S.E.2d 214[, 216 (1947)]."

court of the county. In addition, we find that W.Va.Code, 51–3–5, goes beyond simple budgetary allocations and confers authority on the sheriff to assign a deputy sheriff to the court as its bailiff. This application of the plain language in W.Va.Code, 51–3–5, is not, in our view, inconsistent with the general purposes of the Reorganization Amendment, and, therefore, the statute facially meets constitutional muster.

## IV.

Determining that W.Va.Code, 51–3–5, vests selection of a bailiff on the sheriff and has not been superseded by the Reorganization Amendment does not end our analysis or inquiry in this case. We must still explain why we assign to judges the direction and control of bailiffs and whether applying the plain and literal language of W.Va.Code, 51–3–5, under the circumstances of this case would render an absurd or unconstitutional result or would defeat the purpose of the statute.

■ Although the proper analytical starting point is W.Va.Code, 51–3–5, neither that provision nor Rule VII is particularly instructive in identifying who directs and controls bailiffs and how judge-sheriff conflicts over bailiff selections are to be resolved. We noted in *Rutledge*, 175 W.Va. at 378–79, 332 S.E.2d at 834, that the Reorganization Amendment established a hierarchy among circuit judges and centralized administrative power. The Reorganization Amendment essentially made the Chief Justice of the Supreme Court the administrative head of all courts. Significantly, the administrative power vested in the Chief Justice of the Supreme Court also flows to the lower court judges. *See* Syllabus Point 2, *Rutledge v. Workman, supra* (stating that the administrative authority is reposed in the Chief Justice of the Supreme Court and in the circuit court judges).

As mentioned above, altering the administrative structure did not negate all prior laws that are tangentially related to administra-tive matters. To the contrary, the Reorganization Amendment provides us with a hierarchy to be used in resolving administrative conflicts and problems. As we explained in *Rutledge*, this Court's "exclusive authority over the administration, and primary responsibility for establishing rules of practice and procedure, secures businesslike management for the courts and promotes simplified and more economical judicial procedures." 175 W.Va. at 379, 332 S.E.2d at 834. Under the Amendment, the Judiciary, not the executive branch, is vested with the authority to resolve any substantial, genuine, and irreconcilable administrative conflicts regarding court personnel. *See Rutledge v. Workman, supra.*

The judicial system was revised, among other things, to simplify the administrative process and to complement prior nonconflicting statutory and case law. Clearly, the administrative structure requires that if there is a conflict, we must not only consider the concerns of the parties, but also look at the hierarchy of the court system. The administration of the court is very important to the unobstructed flow of court proceedings and business. Court actions are complicated enough without adding to their complexity a struggle over every administrative decision to be made. The purpose of judicial administrative authority is to enhance and simplify our court system and not to burden it.

■ The controversy between the relator and the respondents qualifies as an administrative dispute because of the bailiff's role in court proceedings. We have defined a bailiff as " '[a] court officer or attendant who has charge of a court session in the matter of keeping order, custody of the jury, and custody of prisoners while in the court.' " *In re Pauley,* 173 W.Va. 228, 233, 314 S.E.2d 391, 396 (1983), *quoting* Black's Law Dictionary 129 (5th ed. 1979). We noted that "it is essential that the bailiff understands his role as an officer of the court attendant to the judge or magistrate to whom he is assigned." [14] 173 W.Va. at 233, 314 S.E.2d at

14. Judge Frazier and the Judicial Association argue that a well-trained bailiff with undivided loyalties is essential to the operation of the court system and that the only way to achieve such allegiance to circuit court judges is through independence. Wisely, the respondents do not dis-

396. In *Rutledge,* we recognized the administrative relationship between judge and clerk. Although a bailiff and a clerk of court play different roles in court proceedings, they both are equal and essential participants in the proper functioning of the judicial system. *See Rutledge v. Workman, supra.*[15] We also found that although clerks for the circuit court fill separately elected positions, clerks still fall under the general rubric of the court system. The Court stated:

"We, however, find no conflict between the election process that selects Mrs. Rutledge from among competing candidates for the job of circuit clerk and a requirement that after being so selected she serve within the hierarchy of judicial authority." 175 W.Va. at 380, 332 S.E.2d at 836.

As in *Rutledge,* we have no problem with the selection process required under W.Va.Code, 51-3-5. The bailiff, as an officer of the court, nevertheless, falls within the administrative hierarchy set up by the Reorganization Amendment. We underscore the point that ministerial attendants such as clerks and bailiffs, regardless of the method of their selection, fall within the administrative control of the court system. Judges are ultimately responsible for any action or inaction of their employees and only a judge can determine whether his assistants are suitable and sufficient for his needs. *Merrill v. Phelps,* 52 Ariz. 526, 533, 84 P.2d 74, 78 (1938); *Shearin v. Fletcher/Mayo/Associates,* 687 S.W.2d 198 (Mo.App.1984); *Eshelman v. Commissioners of the County of Berks,* 62 Pa.Cmwlth 310, 314, 436 A.2d 710, 712 (1981), *order aff'd, sub nom. Eshelman v. American Federation of State, County and Municipal Employees,* 502 Pa. 430, 466 A.2d 1029 (1983) ("it cannot be doubted that judicial power includes the authority to select persons whose services may be required ... to act as assistants of the judges in the performance of their judicial functions.")[16]; *Matter of Court Reorganization Plan of Hudson County,* 161 N.J.Super. 483, 391 A.2d 1255 (1978), *aff'd, Matter of Court Reorganization Plan of Hudson County,* 78 N.J. 498, 396 A.2d 1144 (1979) (it is within the court's inherent power to appoint assistants that satisfy judi-

pute the judge's authority over a bailiff while in the courtroom. Rather, the respondents cling to the statute for the authority to control bailiffs outside the courtroom. The difficulty with the argument of Sheriff Meadows is that the activities of the deputy sheriff outside the courtroom may very well limit what the deputy sheriff does inside the courtroom. For example, Judge Frazier mentions that he is concerned that his bailiff while outside the courtroom may become involved in a criminal investigation and, therefore, would have to testify at trial. Similarly, the judge states that he has had several trials where law enforcement officers have been witnesses. The officers usually testify in uniform and the bailiff wears his deputy sheriff uniform. Judge Frazier is concerned with undue influence of the jury because the bailiff has to interact so closely with the jury.

We cannot ignore Judge Frazier's concerns. Both the United States Supreme Court and this Court have declared error where a bailiff testifies and attends to the same jury. *See Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *State v. Kelley,* 192 W.Va. 124, 451 S.E.2d 425.) In fact, the Court in *Turner* stated:

"It would have undermined the basic guarantees of trial by jury to permit this kind of an association between the jurors and two key prosecution witnesses who were *not* deputy sheriffs. But the role that Simmons and Rispone [the bailiffs] played as deputies made the

association even more prejudicial. For the relationship was one which could not but foster the juror's confidence in those who were their official guardians during the entire period of trial." 379 U.S. at 474, 85 S.Ct. at 550, 13 L.Ed.2d at 429–30.

**15.** In *Rutledge,* 175 W.Va. at 380, 332 S.E.2d at 835, where circuit court clerks and all other county officials were distinguished, we stated:

"Unlike *all* other county officials, the office of circuit clerk is created under *W.Va.* Const. art. VIII, (the judicial article), and not under *W.Va.* Const. art. IX that creates elected county officials with executive and legislative duties, including the prosecuting attorney, sheriff, assessor, county commission, and clerk of the county commission."

**16.** For other Pennsylvania cases supporting this premise, *see also Beckert v. American Federation of State, County and Municipal Employees,* 56 Pa.Cmwlth 572, 425 A.2d 859 (1981), *decree aff'd. Beckert v. American Federation of State, County and Municipal Employees,* 501 Pa. 70, 459 A.2d 756 (1983), *citing Eshelman, supra; Commonwealth ex rel. Bradley v. Pennsylvania Labor Relations Board,* 479 Pa. 440, 444, 388 A.2d 736, 738 (1978) ("[a]ppellants [judges of the court of common pleas] have the power to hire, discharge, and direct the work of their court reporters").

cial needs). The sheriff's office is a separate entity charged with the duty of supplying bailiffs, but the sheriff's selection of a bailiff will not be permitted to undermine the actual needs of the court. We hold that the circuit judge must direct and control bailiffs assigned to the court and that the sheriff's administrative function as it interrelates with the judicial administrative hierarchy must give way to the court's authority in times of substantial, genuine, and irreconcilable conflict.

### V.

We are of the opinion that a "substantial, genuine and irreconcilable" conflict exists between Judge Frazier and Sheriff Meadows concerning the selection of an appropriate bailiff. A careful review of the facts explains our conclusion.

Sheriff Meadows emphasized twice in a letter dated March 21, 1994, that although he had no problems with Judge Frazier hiring whomever he wanted, whoever is chosen would still be an employee of the Mercer County Sheriff's Department and, therefore, subject to the policy of the Department. Following the Wage Board meeting, Sheriff Meadows replaced Judge Frazier's bailiff with a designated bailiff who had not been trained and only had a few days of experience. Sheriff Meadows failed to allow the deputy an opportunity to train with Judge Frazier's civilian bailiff for any period of time. Deputy Roger Kessinger was supposed to assume duties as the designated bailiff on June 21, 1994, docket day for the June Term of Court. Judge Frazier states that this was one of the busiest times for court and there were a number of criminal defendants. However, Deputy Kessinger failed to show at 8:30 a.m. In fact, no one from the Sheriff's Department reported until 9:25 a.m. when Deputy Keith Reed arrived and stated that he did not know where Deputy Kessinger was. Deputy Reed had no experience as a bailiff and reported in an open dress shirt, with no uniform or tie. Later in the day, Judge Frazier discovered that Deputy Kessinger was on vacation for the remainder of the week.

On June 22, 1994, Deputy Reed reported as bailiff for a misdemeanor jury trial. On June 23, 1994, Deputy D.B. Bailey was assigned as bailiff. This deputy, however, also had no experience as a bailiff. The following week, Deputy Kessinger reported as bailiff and served as bailiff except for several days that he was off. On July 14, 1994, Deputy Kessinger failed to report to the court at 8:15 a.m. to perform a security check. A criminal trial was scheduled for 9:30 a.m. At 8:30 a.m., Judge Frazier had to proceed with a domestic hearing without a bailiff. Deputy Earnest, the fourth deputy in three weeks, entered the courtroom around 8:45 a.m. and informed the court that Deputy Kessinger was involved in a high speed chase. Deputy Kessinger reported to court around 9:15 a.m.

On July 16, 1994, the second day of a sexual assault trial, Deputy Kessinger did not report to the court because he had previously scheduled a "comp day." Deputy Kessinger did not ask Judge Frazier if he could have the day off. Deputy Reed reported in place of Deputy Kessinger.

Deputy Kessinger advised Judge Frazier of another day off, which came on the second day of a civil jury trial. Deputy Kessinger had taken a number of days off from work without ever asking the judge for permission. Deputy Kessinger told Judge Frazier that he would arrange for a replacement for August 19, 1994. However, when the trial began that day, no one reported as bailiff. The case concluded that day, but no one was there to take official charge of the jury. After sending the jury back to deliberate on the case, Judge Frazier called Chief Deputy Ralph Bailey and asked why no bailiff had reported. Chief Deputy Bailey said that he was unaware that one was needed. Deputy Reed arrived for bailiff duty about fifteen minutes later dressed in a sports shirt.

On the afternoon of August 19, 1994, at a sentencing hearing for a felony case, Deputy Reed left the defendant sitting alone with his attorney in the courtroom. The defendant had been convicted of unlawful wounding for stabbing his wife and, after a number of months in jail and prison, had been placed on probation. Judge Frazier asked a clerk where Deputy Reed was and she told him

that Deputy Reed was in the back room making a telephone call. After sending the clerk to tell Deputy Reed that his presence was desired and Deputy Reed failing to appear, Judge Frazier was forced to leave the bench to get Deputy Reed. Judge Frazier met Deputy Reed as he was coming out the door. When asked why he had left the courtroom, Deputy Reed informed the judge that he was taking time to make a call on a case that he was investigating. Judge Frazier informed Deputy Reed that it was necessary that he remain in the courtroom, especially when a prisoner was present without any security.

The designated bailiffs have performed general law enforcement duties during the time when Judge Frazier has no scheduled hearings. Judge Frazier is legitimately concerned about what will happen when one of the cases that his bailiff is investigating comes before him.

■ These exceptional facts constitute the kind of conflict that threatens the efficient and fair functioning of the judicial system in Mercer County and requires this Court to assert its ultimate responsibility and authority. Notwithstanding the plain language of W.Va.Code, 51–3–5, and its facial constitutionality, its continued literal application in face of the substantial, genuine, and irreconcilable conflict between the circuit court and Sheriff Meadows would create an absurd result. Because the dispute between Sheriff Meadows and Judge Frazier has the potential to disrupt judicial proceedings and thus interfere with the administration of justice, a complete denial of Judge Frazier's requested relief would contribute to a chaotic situation and frustrate the legislative purpose of requiring bailiffs in the State's trial courts to ensure security and efficiency. To be specific, a sheriff's right to initially select a court's bailiff may not obstruct a court's inherent power to control the administration of

justice and conduct orderly judicial proceedings.

## VI.

■ The final point that we must consider is whether mandamus is appropriate in light of the foregoing discussion. It is well established in this jurisdiction that a writ of mandamus is only granted in extraordinary circumstances. In Syllabus Point 2 of *State ex rel. Kucera v. City of Wheeling,* 153 W.Va. 538, 170 S.E.2d 367 (1969), we stated when a writ of mandamus will issue:

"A writ of mandamus will not issue unless three elements coexist—(1) a clear right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy."

*See also Allen v. State, Human Rights Comm'n,* 174 W.Va. 139, 145, 324 S.E.2d 99, 105 (1984); *Reed v. Hansbarger,* 173 W.Va. 258, 261–62, 314 S.E.2d 616, 619–20 (1984); Syllabus Point 1, *West Virginia Citizens Action Group, Inc. v. Daley,* 174 W.Va. 299, 301, 324 S.E.2d 713, 715 (1984); Syllabus Point 3, *State ex rel. Council of the City of Charleston v. Hall,* 190 W.Va. 665, 666, 441 S.E.2d 386, 387 (1994).

W.Va.Code, 51–3–5, states that it is the duty of the sheriff, or his deputy, to serve as a bailiff for a circuit judge. In an analogous situation, W.Va.Code, 50–1–14, also allows a magistrate to petition for a writ of mandamus in order to enforce the provisions of this statute.[17] It cannot reasonably be questioned that a circuit court judge has a clear right to a bailiff and this point has been established by the statute and the Rules. Furthermore, we have noted that W.Va. Code, 51–3–5, and Rule VII vests the duty of providing bailiffs in the sheriff's office in each county. A judge has no other remedy

---

17. W.Va.Code, 50–1–14, covers the duties of the sheriff, service of process, and bailiffs. The relevant portions are as follows:

"Subject to the supervision of the chief justice of the supreme court of appeals or of the judge of the circuit court, or the chief judge thereof if there is more than one judge of the circuit court, it shall be the duty of the sheriff, or his designated deputy, to serve as bailiff of a magistrate court upon the request of the magistrate. Such service shall also be subject to such administrative rules as may be promulgated by the supreme court of appeals. A writ of mandamus shall lie on behalf of a magistrate to enforce the provisions of this section."

than a writ of mandamus if a bailiff is unsatisfactory. All three elements for a writ of mandamus are satisfied in this case.

Under these facts and circumstances, a writ of mandamus is issued directing the respondents to provide and compensate a qualified bailiff selected by the relator[18] and the bailiff is to be required to work under the exclusive control and direction of the circuit court. Thus, the writ is granted as moulded for the aforementioned reasons.

Writ granted as moulded.

BROTHERTON, C.J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.

---

18. We emphasize that we do not hold that judges in every case, or even in the usual case, select the bailiff. The relief here is moulded to the particular facts of this case, where a sheriff and a circuit judge have reached an irreconcilable conflict that threatens to disrupt the efficient operation of the circuit court. As we concluded above, the selection of the bailiff is ordinarily to be made in the first instance by the sheriff. Were we to hold otherwise, our decision would create a possible conflict between W.Va.Code, 51–3–5, and Section 40 of Article VI of the West Virginia Constitution, which provides that the "legislature shall not confer upon any court, or judge, the power of appointment to office, further than the same is herein provided for."